## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

THE DELPHI CONNECTION, LLC,

      Plaintiff,

    v.

ANGÉLIQUE PARISOT-POTTER,

      Defendant.

Case No. 2:24-cv-00789-JLB-NPM

**JURY TRIAL DEMANDED**

### SECOND AMENDED COMPLAINT

Plaintiff The Delphi Connection, LLC ("Delphi"), by and through its attorneys, files this Second Amended Complaint for Injunctive Relief and Monetary Damages and in support thereof avers as follows:

### NATURE OF THE ACTION

1.  This action seeks redress for Defendant Angélique Parisot-Potter's ("Parisot-Potter") felonious unauthorized recording and distribution of Delphi's confidential executive leadership training sessions and her unprovoked and slanderous and libelous campaign against Delphi. These actions have resulted in severe harm to Delphi's business and the stellar reputation it spent over two decades cultivating.

2.  Delphi is an international consulting firm that has invested over 23 years in assisting Fortune 500 companies and other businesses with vital professional services, including executive coaching and development training.

Delphi prides itself on providing the highest-quality services to its clients and, through its efforts, has a rich history of achieving extraordinary results for professionals in their leadership and management performance.

3.    Delphi's highly coveted client-tailored programs and retreats have been attended by executives and entrepreneurs from countless industries, including chemical, real estate, financial services, educational, energy, food, governmental, healthcare, legal, nonprofit, and pharmaceutical. Delphi's existing client relationships have extended over a decade, and across the United States and the Caribbean, including in Trinidad and Tobago ("Trinidad"), Jamaica, Barbados, Curacao, and Guyana. Until Parisot-Potter's recent defamatory, slanderous, and malicious attacks, Delphi consistently received positive reviews and referrals for future program participants.[1]

4.    Delphi's Executive Program is a transformational leadership program for executives and organizational leaders that focuses on developing self-awareness. The year-long small group program, limited to up to five participants based on the nature of the individual work done with each participant, includes four three-day conferences, a monthly group call, and individual coaching sessions.

---

[1] *See* Delphi Sphere Consulting, *Some of Our Clients and What They Say*, https://www.delphisphere.com/who-they-are.

5.      Ms. Parisot-Potter voluntarily participated in Delphi's Executive Program from February 8, 2022 to March 6, 2023 through her employer. As part of the Executive Program, she participated in four in-person conferences, three in Florida and one in Trinidad.

6.      During the Executive Program, unbeknownst to Delphi, Parisot-Potter made audio recordings of Delphi's private conference sessions, despite Delphi's explicit instructions that all conference presentations were to be kept confidential.

7.      In the meantime, Parisot-Potter's relationship with her employer, the Massy Group ("Massy"), appears to have deteriorated. In late December 2023, amid negotiations with Massy over her looming dismissal, Parisot-Potter resigned her role as Executive Vice President, Business Integrity and Group General Counsel.

8.      Shortly before her resignation, Parisot-Potter embarked on a campaign to turn shareholders against Massy's executives and board of directors. As part of her campaign, Parisot-Potter attacked Massy's practice of allowing its executives and board members to participate in the Executive Program.

9.      Following her resignation from Massy and over the course of 13 weeks in spring 2024, Parisot-Potter posted a 13-part series of essays on LinkedIn. Ostensibly addressing the topic of corporate governance, the series

devolved into an attack on Massy. For instance, she spent several installments vehemently denouncing Massy's participation in Delphi's Executive Program.

10.    In her essays, Parisot-Potter portrayed Delphi's legitimate and highly regarded training program as a "mystical," "unscientific" "cult" led by "gurus" who exerted "undue influence" over corporate executives. Among other outlandish falsehoods, Parisot-Potter claimed that Delphi promised to enable its participants to "talk to the dead" and "control the weather."

11.    In the first half of 2024, Delphi became aware that Parisot-Potter had recorded its confidential sessions when, in a seeming attempt to drive readership to her LinkedIn series, Parisot-Potter published cherry-picked audio clips from the Executive Program on her public social media pages. Parisot-Potter purposefully excerpted, decontextualized, and paired the audio recordings with text, images, and captions intended to make Delphi's program seem ridiculous and sinister. An example of one such post is below:



12.     Parisot-Potter's attempt to subject Delphi to distrust and disgrace in the business community worked. Since she commenced her smear campaign against the Executive Program, Delphi has lost 100% of its business in the Caribbean and 80% of its business in the United States. Delphi seeks at least $10 million in compensatory damages from Parisot-Potter for financial losses suffered by Delphi to date, including lost profits that would have been realized, compensatory damages for financial losses that Delphi continues to suffer, in addition to punitive damages, interest, costs, and attorneys' fees.

## PARTIES AND JURISDICTION

13.     Delphi is a Florida LLC whose members are citizens of the State of Florida.

14.     On information and belief, Parisot-Potter is a citizen of Trinidad, a foreign state.

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is an action between a citizen of a U.S. state and a citizen of a foreign state in which the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Parisot-Potter under Florida's long-arm statute for Count I (Florida Security of Communications Act violation), because Parisot-Potter recorded Delphi's Executive Program while physically present in Florida several times. Fla. Stat. Ann. § 48.193(1)(a)(2);

*see also Ileyac Shipping, Ltd. v. Rivera-Gomez*, 899 So.2d 1230, 1232 (Fla. Dist. Ct. App. 2005) (quoting *Godfrey v. Neumann*, 373 So.2d 920, 922 (Fla. 1979)).

17.    This Court likewise has personal jurisdiction over Parisot-Potter under Florida's long-arm statute for Counts II through VI (defamation, defamation *per se*, defamation by implication, injurious falsehood, and interference with advantageous business relationship), because Parisot-Potter published false and defamatory statements about Delphi, a Florida business, on LinkedIn and other social media websites, all of which are accessible in Florida, where she directed her conduct. Fla. Stat. Ann. § 48.193(1)(a)(2). The false and defamatory statements that Parisot-Potter published about Delphi incorporate selective excerpts of recordings that Parisot-Potter made in violation of the Florida Security of Communications Act while in Florida.

18.    On information and belief, third parties in Florida accessed and viewed Parisot-Potter's false and defamatory statements. *See Internet Sols. Corp. v. Marshall*, 39 So.3d 1201, 1216 (Fla. 2010). For example, Parisot-Potter's September 1, 2024 post on LinkedIn, where Parisot-Potter has over 4,500 "followers," defamed Delphi's Executive Program and called for Massy's shareholders to remove the company's chairman because he participated in it. LinkedIn users in Florida (as indicated by biographical information on their profiles) interacted with the post, and Parisot-Potter engaged with them. For example, as shown in the screenshot below, Parisot-Potter "liked" a comment

6

by user Indira Narinesingh, who, on information and belief, works or resides in Florida:



19.    The resulting loss of Delphi's business, which Parisot-Potter's statements were calculated to cause, was felt by Delphi in Florida, where it is headquartered. *See MasTec Renewables P.R. LLC v. Mammoth Energy Servs.*, Case No. 2020 WL 6781823, at *9 (S.D. Fla. Nov. 18, 2020); *see also Elandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1331 (S.D. Fla. 2010) (noting that a person is subject to personal jurisdiction under Florida's long-arm statute if his or her acts "interfere[] with a business relationship outside of Florida that causes injury in Florida").

20.    Additionally, exercising personal jurisdiction over Parisot-Potter for Delphi's causes of action would not offend the Due Process Clause of the Fourteenth Amendment. Parisot-Potter recorded Delphi's Executive Program while in Florida and published false and defamatory posts aimed at Delphi, a

Florida business. *See Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1159 (S.D. Fla. 2017). Furthermore, as shown above, Parisot-Potter's social media activity included interactions with users in Florida. *Id*.

21.    Parisot-Potter knew or should have known that her actions would cause injury to Delphi in Florida. In email exchanges with Parisot-Potter, Delphi included its Florida address in its signature block. Parisot-Potter also had access to invoices showing Delphi's Florida address, which she posted on her LinkedIn account on August 8, 2024.

22.    Moreover, exercising personal jurisdiction over Parisot-Potter comports with traditional notions of fair play and substantial justice as any burden on Parisot-Potter would be significantly outweighed by (a) Florida's strong interest in protecting its citizens from the unlawful recordings of their private communications and false and defamatory publications, (b) Delphi's interest in litigating its claims at home in Florida, and (c) the justice system's interest in having claims under United States law adjudicated by U.S.-based courts that are familiar with the American legal regime. *See id*. at 1162.

23.    Furthermore, Florida is the only available jurisdiction by which Delphi can obtain full relief because Trinidad, where Parisot-Potter is domiciled, does not have a cause of action, by statute or otherwise, that prohibits recording oral communications without consent like the Florida

Security Communications Act. And a court in Trinidad would be unable to enforce this Florida statute.

24.    Venue is proper in the United States District Court for the Middle District of Florida, because the tortious conduct took place in this District and because its effects were felt by Delphi in this District.

## FACTUAL ALLEGATIONS

### A.    Parisot-Potter's Participation in the Executive Program.

25.    From February 2022 to March 2023, Parisot-Potter, along with other Massy executives, participated in Delphi's Executive Program.

26.    Parisot-Potter participated in four in-person Executive Program conferences in Bonita Springs, Florida from March 23 to 25, 2022; Miami, Florida from June 22 to 24, 2022; Port of Spain, Trinidad from October 25 to 27, 2022; and Bonita Springs, Florida from January 25 to 27, 2023. Weekly individual calls were also held, when possible, between conferences.

27.    Executive Program sessions are private and confidential. Delphi explained this during the first conference session and received verbal confirmation that each participant would honor the confidentiality of the sessions. At subsequent conference sessions, Delphi reminded the participants that conference discussions were to remain confidential. Delphi did not even record the sessions for its own use.

28.    Despite these admonitions, unbeknownst to Delphi and without Delphi's permission, Parisot-Potter made audio recordings of Delphi's Executive Program sessions, including of the in-person sessions in Florida, using an electronic, mechanical, or other device for capturing and recording sound.

**B.    Parisot-Potter Publishes a LinkedIn Series Attacking and Making False Claims about Delphi's Executive Program.**

29.    Following her resignation from Massy, Parisot-Potter posted a 13-part series of essays, called the "Corporate Chronicles," to her public LinkedIn page. These posts contained false and defamatory statements about Delphi and the Executive Program, including, but not limited to, the following examples:

30.    On February 24, 2024, Parisot-Potter wrote, "In another example, we see a weak board, acting in a manner that suggests complicity, collusion and other dubious behaviours that may be driven by conflicts of interests, and by dictates from a highly-paid 'Guru' (smartman) peddling absurd notions such as 'reality' can be altered by mere thought or by 'changing your mind' and that weather can be controlled."

31.    In the same post, she wrote, "Regardless of how business leaders choose to 'idolise' highly paid gurus, they cannot delegate logic and responsibility because they still have a real responsibility to shareholders who are '**alive**' and well. These **living** shareholders need answers…." (emphasis in

original.) The bolded terms would be understood by Parisot-Potter's readers as references to her claim that Delphi promised to enable participants to talk to the dead. Additionally, her claims of undue influence are inconsistent with the appropriate role of a management training consultant and were intended to cause members of the business community to distrust Delphi's program.

32.    On March 9, 2024, Parisot-Potter published a post called "Letting Go of Logic: The 'CULT' in Culture," in which she wrote that "This 'executive leadership programme', which we shall call the OneWay, promises the impossible: the power to control reality with your mind and to conjure up a 'different' reality. This clearly isn't personal development; it is an irresponsible scheme that disregards logic and reason in the management of a corporation entrusted with shareholder funds."

33.    On March 16, 2024, Parisot-Potter continued her characterization of Delphi as a "cult," presented as a case study in her new installment, "The OneWay: A Cult Uncovered." She wrote, "In the heart of a once-respectable corporation, a miracle occurred! A pair of self-help gurus, close friends of the gullible GM, unveiled their revolutionary 'executive leadership programme.' This magical marvel promised to liberate the company from the shackles of…well, thinking too hard." She also wrote that "The OneWay promised the impossible and at the highest levels – even those with fiduciary responsibility imbibed the 'Kool-Aid' and surrendered their roles and their common-sense to

a cash-intoxicated cult leader. They immersed in 'lessons' to deploy power to control reality with your mind" and that "The Ones painted it as the ultimate tool for controlling reality, weather, life itself! Nothing bad would ever happen to anyone who did the programme! So they said."

34.     The following week, Parisot-Potter further attacked Delphi's training methods. Under the heading "Dangerous Practices – Outlawed Elsewhere," she wrote, "In Episode 9, I introduced the OneWay (pseudonym) Programme that served as the cog of leadership thinking for a company of corporate chanters and followers. This week, we delve into those practices that would cause any right-thinking person to cringe and question." And, further down the page, she continued, "Think the recall of repressed memory tactics, the kind medically trained, mental health professionals now condemn as harmful and which are no longer part of good psychology or medical practice and capable of creating false memories or retraumatizing individuals. This formed part of the Programme's 'methodologies.'"

35.     Although the posts initially did not identify Delphi by name and later used a pseudonym for the company, later posts identified Delphi by name and several linked to the personal social media page of one Delphi's proprietors and referenced him by name. It was thus clear to the general reader that Parisot-Potter had been referring to Delphi all along. Examples, excerpted from such posts, are below:



ChatGPT prompt: Midjourney island

# Corporate Chronicles



**Angélique Parisot-Potter**
Integrity Matters | TED Speaker | Non-Executive 15 articles  ( + Follow )
Director

March 16, 2024

( 🔲 Open Immersive Reader )

Episode 9 of a 13-part weekly series on good governance and ethical conduct.

*In this series I will examine issues of corporate governance and matters of public interest. If readers have specific business integrity and governance topics they'd like me to explore, please message me here on LinkedIn, Facebook or email.*

## The OneWay: A Cult Uncovered

### An Absurd and Appalling Corporate Tale

In the heart of a once-respectable corporation, a miracle occurred! A pair of self-help gurus, close friends of the gullible GM, unveiled their revolutionary "executive leadership programme." This magical marvel promised to liberate the company from the shackles of ... well, thinking too hard.

Drunk on their promises, the GM, either fool or fanatic, became their torchbearer, commandeering his executives who in turn despatched their executives, who in turn ... much like a Pyramid (more like a Ponzi) scheme. Over a decade it *slithered* and *slid* and *spread* its tentacles throughout the organisation.

They called it **The OneWay.**

### Follies, Foibles and Fallacies

Sure, some GMs/CEOs might have a fancy title, a corner office, and an ego the size of a small country. But even emperors have to answer to someone. A sensible executive programme? Absolutely! Bring on the team-building! But when "leadership development" becomes code for indoctrination, brainwashing and cultism masking as "alignment", someone needs a crash course in critical thinking, starting way up at the top. We're talking large-scale, top-level delusion here, folks.

### Whispers of the OneWay

The OneWay promised the impossible and at the highest levels – even those with fiduciary responsibility imbibed the "Kool-Aid" and surrendered their roles and their common-sense to a cash-intoxicated cult leader. They immersed in "lessons" to deploy power to control reality with your mind. No brain power needed here, folks – just tap into the energy and the energy will do the work. This wasn't about personal development; this was about dismantling logic at the heart of a major corporation.

### Corporate Gullibility 101: The OneWay Masterclass

Whatever the catalyst, the OneWay took root, promising nothing less than unlocking the full potential of both individuals and the company itself. The 'gurus' claimed that they had **"studied the brain for decades"** despite having no training whatsoever in psychology, neuroscience, or any



ChatGPT and Midjourney: Alice, The Joker and the Clueless One

## Corporate Chronicles

Angélique Parisot-Potter
Integrity Matters | TED Speaker | Non-Executive  15 articles  + Follow
Director

March 23, 2024



Episode 10 of a 13-part weekly series on good governance
and ethical conduct.

*In this series I will be examining issues of corporate
governance and matters of public interest. If readers have
specific business integrity and governance topics they'd like
me to explore, please message me here on LinkedIn,
Facebook or email.*

## Through the Looking Glass: Bizarre
## Business Beliefs

### Dangerous Practices – Outlawed elsewhere

In Episode 9, I introduced the OneWay (pseudonym)
Programme that served as the cog of leadership thinking
for a company of corporate chanters and followers. This

gurus who "spoke with the voice of god" (according to
them) and who were the "**leaders in the energy field**" (not
oil and gas but "karmic energy"). So, the hapless executives
said nothing and sat around to await the "**happenings**" and
"**the unfolding of the universe.**"

In this environment, where magical thinking was the
(dis)order of the day and the gurus insisted: "you can't use
logic in this", the one dissenting voice began to doubt their
own judgement and their professional expertise, as the
programme's methods created an atmosphere that felt
almost cult-like within the organisation. These echoes of
cult-like tactics were undeniable: gaslighting, demands for
unwavering obedience, and an insidious erosion of
personal and private boundaries.

It was alarming enough for executives to undergo such
manipulation, but the fact that the **Chair of the Board**
himself participated, along with other **silent and complicit
board members** for the year long programme should have
sent alarm bells ringing throughout the entire organisation.

**The Friday Farce**

The lunacy didn't stop there. Paid for by the company in
scarce Fx, the top gurus held weekly Friday calls for years,
attended by the CEO and top executives, including the
Governor of Growth, the Prophetess of Platitudes
responsible for people and the Goddess of Governance …
responsible for … **governance**. One wonders what kind of
"**governance**" this was.

At these "sessions" with these so-called leaders, imagine
personnel files and confidential company information being
openly shared with a TRAINING CONSULTANT, and high-
level decisions made, as the lines between corporate
strategy and dubious self-discovery became increasingly
blurred.

**Guardians and Guides?**

But perhaps most chilling were the private coaching
sessions between the Gurus, the Chairman, and the
Goddess of Governance – both supposed guardians of

★★★

36.    In Parisot-Potter's April 6, 2024 post, "The Whistleblower and the

Truth Teller," she removed any semblance of anonymization, including a link

to a YouTube video of her address at the December 2023 Massy shareholder

meeting. In the video, Parisot-Potter identifies Delphi and the Executive Program by name and claims that "their bizarre rituals include that they can train Massy employees to communicate with the dead and that attendees can self heal with White Light energy." She states that "This is a matter of grave concern to shareholders because the couple leading this program appear to assert disproportionate influence over our executive team."

37.    As a former participant in the Delphi Executive Program, Parisot-Potter knew or should have known that her statements about the program's methods, promises, and substance were false. Parisot-Potter's false and defamatory statements were made with knowledge and malice with the intent of causing immediate and irreparable harm to Delphi.

38.    Parisot-Potter's campaign against Delphi and its principals did not end with the "Corporate Chronicles" series. On August 8, 2024, Parisot-Potter made a LinkedIn post lambasting Delphi's principals, stating that "this seemingly deluded couple's beliefs" "have zero place in a corporate setting." She also panned Delphi's services to its clients, writing "What strategic value did Delphi offer? What are the credentials of Mr & Mrs D[ominguez]? I mean, they cornered the market in exec training for one of the largest regional conglomerates to the tune of US$500K – US$1M ANNUALLY for 14 YEARS . . . . sent outside T[rinidad] and straight into the pockets of Mr & Mrs D."

15

39.    On August 23, 2024, Parisot-Potter made another LinkedIn post disparaging Delphi's Executive Program and the Massy executives who participated in it, and tagging one of Delphi's principals. The post included an image of a November 2023 invoice from Delphi to the Massy Group. The unredacted[2] image displayed Delphi's Florida address and showed Delphi receiving payment in Florida for its services. Parisot-Potter's posts were accessible to and accessed by LinkedIn users worldwide, including users located in Florida.

## C.    Parisot-Potter's Social Media Posts Defaming Delphi and Illegal Distribution of Recordings of Delphi's Oral Communications.

40.    In an apparent attempt to drive readership and engagement to her LinkedIn series, in the first half of 2024, Parisot-Potter published a series of social media posts, cross-posted in various iterations to her public Instagram, X (formerly Twitter), and Facebook pages.

---

[2] This was clearly not a mistake. The following day, Parisot-Potter made a second post with the same content, except that, in the new version, personal information and addresses were redacted from the invoice. However, Parisot-Potter did not delete the original post. Rather, she left a facetious comment underneath the post showing that she was completely unconcerned with exposing this personal information online:



41.     These posts, which provided links to Parisot-Potter's LinkedIn series, included sound clips from Parisot-Potter's illegal recordings of the Executive Program. The sound clips, representing mere minutes from a 200-plus-hour training program, were cherry-picked and decontextualized to make the Executive Program seem mystical and outlandish.

42.     Indeed, in a comment on her August 23, 2024 LinkedIn post, Parisot-Potter boasted that she has "hours and hours of audio" from the Executive Program sessions.

43.     Furthering this characterization, Parisot-Potter juxtaposed the sound clips with apparently AI-generated images, disconcertingly depicting such motifs as crystal balls, characters from Alice in Wonderland, and creepy-looking corporate figures. Parisot-Potter further included text and animated "stickers" communicating to her audience that the program was outlandish and ridiculous.

44.     For example, in an Instagram Post linking to the March 23, 2024 installment of her LinkedIn series, Parisot-Potter overlaid audio from one of Delphi's sessions ("You have to let go of logic. You can't use logic in this.") with the title "Corporate Chronicles: Through the Looking Glass" and an animated sticker of the Kool-Aid mascot—a reference to her accusation in the LinkedIn post that, "While not bearing the physical effects of the Jim Jones cult, these gurus created a similar environment where, questioning their pronouncements

17

and those of the 'leaders' that 'followed' their teachings and tenets, was

tantamount to heresy."[3] An example of one of her posts is below:



45.    An additional representative example of Parisot-Potter's posts is

below:



---

[3] Parisot-Potter's readers would readily understand the "Kool-Aid" and "the Jim Jones cult" language as a reference to the mass suicide of members of the Peoples Temple Agricultural Project cult in Guyana in November 1978.

**D.    Parisot-Potter Also Engaged in a Media Campaign to Disparage Delphi.**

46.    Parisot-Potter did not constrain her defamatory statements about Delphi to her personal social media pages. As explained above, Parisot-Potter first presented her falsehoods about Delphi to the public at Massy's December 2023 Annual General Meeting. Several media outlets republished Parisot-Potter's defamatory statements about Delphi and the Executive Program.[4]

47.    Parisot-Potter also brought her campaign against Delphi to the media. In January 2024, Parisot-Potter participated in an "exclusive" interview with Asha Javeed of the Trinidad and Tobago Guardian in which she repeated and expanded on her defamatory statements about Delphi's practices.[5] Parisot-Potter once again claimed that Delphi's "principles held a 'disproportionate influence' over [Massy's] executives." She also disparaged the "credibility of the couple—Paul and Indira Dyal-Dominguez—running the programme and what she described as their 'mumbo-jumbo' language of learning."

---

[4] *Massy starts disciplinary process against outspoken executive*, ST. VINCENT TIMES, Dec. 21, 2023, at https://www.stvincenttimes.com/massy-starts-disciplinary-process-against-outspoken-executive/ (last accessed Mar. 20, 2025); Asha Javeed, *Angelique's exit from Massy…no ordinary whistleblower, hoping her words hold weight*, TRINIDAD & TOBAGO GUARDIAN, Jan. 7, 2024, at https://www.guardian.co.tt/news/angeliques-exit-from-massy-6.2.1892773.dd4f48a2b6 (last accessed Mar. 20, 2025).

[5] Asha Javeed, *Angelique's exit from Massy…no ordinary whistleblower, hoping her words hold weight*, TRINIDAD & TOBAGO GUARDIAN, Jan. 7, 2024, at https://www.guardian.co.tt/news/angeliques-exit-from-massy-6.2.1892773.dd4f48a2b6 (last accessed Mar. 20, 2025).

48.     Parisot-Potter also caused to be released to and republished by the media a 13-page letter to Massy's executives that she had "used as consideration in her negotiations to exit the company for 11.8 million pounds sterling (TT$100 million) as well as a seat on Massy's board."[6] The letter contained further defamatory claims against Delphi, including that Delphi "claimed to control the weather and cure cancer" and that Parisot-Potter had suffered verbal abuse from Paul Dominguez. These claims are completely false.

49.     Parisot-Potter's media campaign against Delphi caused irreparable harm to its reputation. It sparked significant public discourse ridiculing and demonizing the Delphi Executive Program. As one Letter to the Editor put it, "The allegation about communicating 'with the dead' is loaded. A significant segment of the public now seems to believe that Massy managers have been engaged in occult practices. That the jumbie is out of the coffin. Occultism is good for a laugh in T[rinidad]&T[obago] and the jokes and memes haven't disappointed. However, I've been hearing from religious leaders who believe that it's true—and it's dead serious."[7]

---

[6] *Angelique's allegations: Verbal abuse, forced exit from Massy*, CNC3, April 14, 2024, at https://www.cnc3.co.tt/angeliques-allegations/ (last accessed Mar. 20, 2025).

[7] Orin Gordon, Letter to the Editor, *Parisot-Potter vs Massy; why I'm inspired yet unconvinced by tales of bizarre rituals*, WIRED868, Jan. 2, 2024, at https://wired868.com/2024/01/02/orin-parisot-potter-versus-massy-why-im-inspired-yet-unconvinced/ (last accessed Mar. 20, 2025).

50.     The damage to Delphi's reputation from this reporting went beyond public ridicule; Parisot-Potter's smear campaign drove away significant portions of Delphi's existing clients and irreparably damaged its reputation in the business community.

**E.     Parisot-Potter's Campaign of Falsehoods Caused Substantial Harm to Delphi's Business.**

51.     At the time Parisot-Potter began her campaign, Delphi was in the midst of an Executive Program for four Massy employee participants. In January 2024, Massy cancelled the employees' participation in that program.

52.     Massy also cancelled an Executive Program that was scheduled to start in April 2024 in which several Massy employees had already agreed to participate.

53.     Parisot-Potter's attack did not just drive away Delphi's business with Massy. In February 2024, Delphi was engaged by a Big Four accounting firm to do a program in Jamaica in spring 2024. After postponing the program, that firm decided not to move forward with the program.

**CAUSES OF ACTION**

**COUNT I**
**(Violation of the Florida Security of Communications Act, Fla. Stat. § 934.01 *et seq.*)**

54.     Delphi adopts and incorporates each and every allegation of Paragraphs 1-53 of this Second Amended Complaint as if stated fully herein.

55.    Parisot-Potter committed a felony in violation of the Florida Security of Communications Act, Fla. Stat. § 934.01 *et seq.*, through her unauthorized recording of Delphi's confidential Executive Program sessions in Bonita Springs and Miami, Florida in March 2022, June 2022, and January 2023.

56.    Delphi's statements during the Executive Program conference sessions were oral communications made with the expectation that such communications were not subject to interception and under circumstances justifying such expectation.

57.    Parisot-Potter "intercepted" Delphi's oral communications by making audio recordings of the Executive Program sessions.

58.    Parisot-Potter intercepted, used, and/or distributed Delphi's oral communications in violation of Fla. Stat. § 934.03, and she continues to use and distribute recordings of Delphi's oral communications.

59.    Delphi is afforded a private cause of action against Parisot-Potter pursuant to Fla. Stat. § 934.10(1).

60.    Pursuant to Fla. Stat. § 934.10(1), Delphi is entitled to preliminary or equitable or declaratory relief, actual damages, liquidated damages, punitive damages, and/or attorneys' fees and litigation costs.

## COUNT II
## (Defamation)

61.    Delphi adopts and incorporates each and every allegation of Paragraphs 1-53 of this Second Amended Complaint as if stated fully herein.

62.    By engaging in the acts alleged in this Second Amended Complaint, Parisot-Potter knowingly and maliciously published both false statements of fact and true statements of fact creating a false impression, which statements defamed and injured Delphi.

63.    Parisot-Potter published the defamatory statements with actual or legal malice in that she did so out of ill will toward Delphi or at least with the knowledge of or reckless disregard for the falsity of her statements.

64.    Parisot-Potter's social media posts were published to, accessed in, and harmed (and continue to harm) Delphi in the State of Florida.

65.    Delphi is entitled to compensatory and punitive damages.

## COUNT III
## (Defamation *per se*)

66.    Delphi adopts and incorporates each and every allegation of Paragraphs 1-53 of this Second Amended Complaint as if stated fully herein.

67.    Parisot-Potter's false statements that Delphi utilized harmful methodologies that had been disclaimed by medical professionals and were utilized by cults, and her statements that Delphi exercised undue influence over corporate executives and board members, among others, are incompatible

with the proper exercise of Delphi's lawful business or trade as an executive training consultant. These statements therefore constitute defamation *per se* under Florida law.

68.     Parisot-Potter's social media posts were published to, accessed in, and harmed (and continue to harm) Delphi in the State of Florida.

69.     A plaintiff bringing a claim for defamation *per se* need not plead or prove the existence of damages. Rather, Florida law presumes the existence of defamation *per se* damages. *See, e.g.*, *Upchurch v. Brickhouse Partners, LLC*, No. 8:19-CV-2580-T-35CPT, 2021 WL 8894452, at *3 (M.D. Fla. Jan. 15, 2021) ("With respect to her defamation claim, general damages are presumed in *per se* defamation actions." (citing *Hoch v. Rissman, Weisberg, Barrett*, 742 So.2d 451, 457 (Fla. Dist. Ct. App. 1999)).

70.     Delphi is entitled to compensatory and punitive damages.

## COUNT IV
### (Defamation by Implication)

71.     Delphi adopts and incorporates each and every allegation of Paragraphs 1-53 of this Second Amended Complaint as if stated fully herein.

72.     Parisot-Potter defamed Delphi by implication by juxtaposing short, decontextualized audio clips from over 200 hours of training in a manner that implied Delphi promoted and promised participants that they would develop mystical powers.

73.     Parisot-Potter published the defamatory statements with actual or legal malice in that she did so out of ill will toward Delphi or at least with the knowledge of or reckless disregard for the false implication created by her statements.

74.     Parisot-Potter's social media posts were published to, accessed in, and harmed (and continue to harm) Delphi in the State of Florida.

75.     Delphi is entitled to compensatory and punitive damages.

### COUNT V
### (Injurious Falsehood)

76.     Delphi adopts and incorporates each and every allegation of Paragraphs 1-53 of this Second Amended Complaint as if stated fully herein.

77.     By engaging in the acts alleged in this Second Amended Complaint, Parisot-Potter maliciously and falsely published statements disparaging Delphi's business that materially and substantially caused others to refuse to deal with Delphi and, in turn, resulted in (and continues to result in) pecuniary losses to Delphi.

78.     Parisot-Potter's statements that Delphi promised participants in the Executive Program that they would learn to speak to the dead and control the weather; that Delphi exerted undue influence over executives and boards at the companies that hired it; and that Delphi employed methods rejected by respected medical professionals and exploited by cult leaders, among others,

should have reasonably been foreseen to influence companies to avoid engaging Delphi as an executive training consultant.

79.    By publishing the false statements in appeals to shareholders to repudiate Massy and businesses spending on Delphi's Executive Program, Parisot-Potter knew or reasonably should have known the statements were likely to persuade third parties not to enter transactions with Delphi.

80.    Parisot-Potter's social media posts were published to, accessed in, and harmed Delphi in the State of Florida.

81.    Following the publication of Parisot-Potter's false statements, Delphi lost 100% of its business in the Caribbean and 80% of its business overall in the United States, including cancellation of the ongoing Massy Executive Program and the already-planned programs of Massy and others.

82.    Delphi is entitled to compensatory and punitive damages.

## COUNT VI
**(Interference with Advantageous Business Relationship)**

83.    Delphi adopts and incorporates each and every allegation of Paragraphs 1-53 of this Second Amended Complaint as if stated fully herein.

84.    By engaging in the acts alleged above, Parisot-Potter tortiously interfered with Delphi's business relationships.

85.    As of early 2024, Delphi was engaged to provide executive training programs for employees of several established corporate clients, including Massy Group and a Big Four accounting firm.

86.    Parisot-Potter knew of Delphi's business relationships with both Massy and other clients, and Parisot-Potter's goal in publicly maligning Delphi's business was to cause shareholders and executives of Delphi's clients to prevent their companies from continuing to do business with Delphi.

87.    As a direct and proximate result of Parisot-Potter's publications, Delphi lost 100% of its business in the Caribbean and 80% of its business in Florida, including cancellation of the ongoing Massy Executive Program and the already-planned programs of Massy and others.

88.    Delphi is entitled to compensatory damages, punitive damages, and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Delphi seeks judgment in its favor for the following:

A.    That judgment be entered against Parisot-Potter and in favor of Delphi on the Causes of Action in this Second Amended Complaint;

B.    That judgment be entered against Parisot-Potter for compensatory damages in an amount to be determined at trial, but no less than $10 million plus the amount of damages that Delphi continues to incur throughout the pendency of this action that is to be determined; statutory damages; punitive damages; injunctive and equitable relief; and any other such relief as may be available to Delphi;

C.    That judgment be entered against Parisot-Potter imposing interest on damages;

D.    That judgment be entered against Parisot-Potter imposing litigation costs and attorneys' fees; and

E.    For all other and further relief as this Court may deem necessary and appropriate.

Delphi demands a jury trial on all issues so triable.

Dated: March 20, 2025                    Respectfully submitted,

                                         By: _/s/ Charles E. Harris, II_____
                                         Charles E. Harris, II
                                         Kristine M. Young
                                         Mairead J. Fitzgerald-Mumford
                                         MAYER BROWN LLP
                                         CHarris@mayerbrown.com
                                         KYoung@mayerbrown.com
                                         MFitzgeraldMumford@mayerbrown.com
                                         71 South Wacker Drive
                                         Chicago, Illinois 60606-4637
                                         Telephone: (312) 782-0600
                                         Facsimile: (312) 701-7711

                                         *Counsel for Plaintiff*
                                         *The Delphi Connection, LLC*